Wilbur F. Bolin and Kathryn M. Bolin, et al. [1] v. Commissioner. Bolin v. Commissioner
Docket Nos. 4970-63, 4742-65, 4743-65.
United States Tax Court
T.C. Memo 1967-9; 1967 Tax Ct. Memo LEXIS 253; 26 T.C.M. (CCH) 62; T.C.M. (RIA) 67009; January 23, 1967
Robert E. Teaford, 50 W. Broad, Columbus, Ohio, and Arthur H. Thomas, Jr., for the petitioners. W. Dean Short, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in Federal income tax and additions to tax in these consolidated proceedings as follows: Additions to tax,
Docket
sec. 6653(a),
No.
Petitioner
Year
Deficiency
I.R.C. 1954
4970-63
Wilbur F. Bolin and Kathryn M. Bolin
1959
$2,787.10
$139.36
1960
5,709.99
285.50
1961
2,323.40
116.17
4743-65
Wilbur F. Bolin
1962
46.28
2.31
4742-65
Wilbur F. Bolin and Damiris M. Bolin
1963
1,031.11
51.56
*255 Both respondent and petitioners have made concessions with respect to some of the issues raised in the notices of deficiency, and these concessions, found in the transcript of the opening statements of counsel and in the briefs filed by the parties, will be reflected in the Rule 50 computations. The questions remaining for decision are as follows: (1) Whether assessment of the deficiency in tax and the addition to tax determined by respondent for the taxable year 1959 is barred by the state of limitations. (2) Whether the deficiency in tax determined by respondent for the taxable year 1959 is invalid because an alleged second examination of petitioner's books and records for that year was in violation of section 7605(b), I.R.C. 1954. [2]
(3) Whether petitioners received ordinary income in the amount of $6,500 in 1959 as a result of a transfer of a residence to them in part payment of a business indebtedness, and in addition, whether they received ordinary business income in the amounts of $570.18 and $219.25 during the years 1959 and 1960, respectively, *256 as a result of payments made by a debtor on a mortgage on their residence in part payment of a business indebtedness. (4) Whether funds received by General Painting Co. should be included in income in the year of receipt, rather than in the year deposited. (5) Whether petitioners are entitled to depreciation for the years 1960 through 1963 on certain vehicles allegedly used in connection with the General Painting Co. business, and if so, the correct amount of depreciation allowable; also whether business deductions were overstated in those years because they included expenditures attributable to personal usage of automobiles. (6) Whether petitioners are entitled to a claimed interest deduction in the amount of $150 for 1960, and also whether a deduction of a portion of the mortgage payments on their residence, in the year 1960, is proper. (7) Whether an adjustment to basis should be made, after an allowance for the investment credit, for certain equipment purchased and used in the ordinary course of a trade or business. (8) Whether a refund in the amount of $2,614.08 of an advance premium deposit received from the Bureau of Workmen's Compensation of Ohio in 1962 should be *257 reported in income for that year; and, in addition, whether an advance premium deposit in the amount of $1,775 paid to the Bureau in 1962 is deductible as an ordinary and necessary business expense. (9) Whether petitioners are liable for the addition to tax under section 6653(a) for the taxable years 1959 through 1963. Findings of Fact Wilbur F. Bolin (referred to herein as Wilbur or petitioner) and Kathryn M. Bolin (referred to herein as Kathryn) were husband and wife residing in Columbus, Ohio, during the years 1959, 1960, and 1961. They were divorced in 1962 and Wilbur married Damiris M. Bolin in 1963. Wilbur and Kathryn filed joint income tax returns for the calendar years 1959, 1960, and 1961, Wilbur filed an individual income tax return for the calendar year 1962, and Wilbur and Damiris filed a joint income tax return for the year 1963, all with the district director of internal revenue, Cincinnati, Ohio, and all on the cash basis of accounting. A written consent extending the time for assessment of the tax due for the year 1959 to June 30, 1964, was executed by, or in behalf of, Wilbur and Kathryn in February of 1963 and was executed by a delegate of the Secretary of *258 the Treasury on March 12, 1963. Respondent mailed a notice of deficiency in tax due for the year 1959 to Wilbur and Kathryn on August 9, 1963. In 1960 an agent of respondent audited petitioner's books and records and determined that additional tax was due from petitioner for the year 1959, which was paid. In 1962 an agent of respondent asked Wilbur if he could see Wilbur's books and records for the years 1960 and 1961, and possibly 1962, and Wilbur made these books and records available to the agent. At some time, probably in late 1962 or early 1963, a special agent of respondent gave Wilbur an undated written memorandum listing certain records needed from Wilbur, which enumerated (1) accounts receivable from date General Painting Co. began work for Eureka Construction Co. to date last payment made by Eureka, (2) sales contract covering sale of General Painting Co. by James Bolin to Wilbur, and (3) record of payments made by Wilbur to James Bolin relative to sale of General Painting Co. Wilbur did not comply with this request on advice of his counsel. On March 20, 1963, a summons was issued to Wilbur by the special agent to produce for examination in connection with the matter of *259 the tax liability of James Bolin the above records for the years 1955-60. Petitioner complied with this summons and the special agent examined these records in the presence of Wilbur and his counsel. On December 3, 1962, Wilbur's counsel wrote to the revenue agent examining Wilbur's returns advising that Wilbur would not accept the adjustments in his taxable income for the years 1959, 1960, and 1961 proposed by the agent, and requested issuance of a 30-day letter. Petitioner purchased General Painting Co., a proprietorship engaged in the contract painting business, in 1955 and continued to operate the business as a sole proprietorship throught the years here involved. [3] The income tax returns filed for the years in question reflect the following with respect to the business of General Painting Co. (referred to herein as Painting Co.): Total re-
Cost of goods
Other business
Year
ceipts
sold
Gross profit
deductions
Net profit
1959
$293,579.95
$244,448.39
$49,131.56
$26,677.20
$22,454.36
1960
278,516.12
233,550.94
44,965.18
31,785.03
13,180.15
1961
438,434.45
354,168.38
84,266.07
69,626.70
14,639.37
1962
329,014.62
244,836.67
84,177.95
62,432.52
21,745.43
1963
380,951.02
305,299.89
75,651.13
63,313.89
12,337.24
*260 Painting Co. kept its books on the cash method of accounting for income and expenses. Painting Co. entered into an agreement with Eureka Construction Co. (referred to herein as Eureka) in 1957 to paint houses in Eureka's housing projects. Painting Co. had difficulty collecting the amounts due it from Eureka but because his brother was an owner and officer of Eureka, petitioner refrained from filing liens against Eureka's projects. However, in the latter part of 1958 Eureka agreed to transfer one of its houses, located at 2539 Regina Avenue, Columbus, Ohio, to petitioner in part payment for the amounts due from Eureka to Painting Co. For purposes of the agreement the property was valued at $26,000 and was to be transferred to petitioner free and clear of all liens. However, petitioner discovered that there was a mortgage on the property and petitioner had to place a $19,500 mortgage on it at the time of transfer to pay off the existing mortgage. The property was transferred to Wilbur and Kathryn by warranty deed dated March 6, 1959. Respondent *261 determined that petitioners received additional income of $6,500 in 1959 as a result of the above transaction and also that petitioners received additional income in the amounts of $570.18 and $219.25 during the years 1959 and 1960, respectively, as a result of mortgage payments made on petitioner's behalf in part payment of the business indebtedness due him. Respondent determined that Painting Co. had business gross receipts, in the form of customers' checks and/or cash in payment for services rendered, on hand at the end of each of the years 1960 through 1963 which were not deposited in the bank nor included in gross income of Painting Co. until the following year; and that the gross income of the business should be increased for each of those years by the amounts on hand at the end of those years and decreased for the years 1961 through 1963 by the amounts on hand but not deposited at the beginning of each of those years. Respondent's determination was that business gross receipts should be increased by the amount of $8,105.80 for 1960, increased by the net amount of $593.77 for 1961, decreased by the net amount of $7,413.07 for 1962, and increased by the net amount of $2,344.50 *262 for 1963. The amounts, and the component parts thereof identified by respondent in his notice of deficiency, were deposited in Painting Co.'s bank account within the first few days of each of the years involved; no further evidence was offered with respect to the issue. Petitioners owned various automobiles, a station wagon, and a 3/4-ton Chevrolet truck during the years here involved, most of which were titled in the names of Wilbur and/or Kathryn, and some of which were titled in the name of Painting Co. Most of the cost of operating all of these vehicles was charged to the account of Painting Co. and deducted by it as business expense. A deduction for depreciation on most of these vehicles was also claimed by petitioners as a business expense. Respondent disallowed $1,000 of the business expenses claimed for each of the years 1960 through 1963 for personal use of these automobiles and also disallowed some or all of the deductions claimed for depreciation on some of these vehicles. The vehicles involved were: (1) 1958 Buick station wagon which cost $4,236.76 new in 1958. This vehicle was used by the superintendent of Painting Co. in its business. Petitioner claimed depreciation *263 on this vehicle on the basis of a 3-year life new. Respondent determined that the vehicle had a remaining life of 3 years as of January 1, 1960, and had a salvage value of $200, and adjusted depreciation accordingly. (2) 1960 Chevrolet Biscayne which cost $2,855.07 when purchased new in February of 1960. This car was driven by petitioners' son, Wilbur F. Bolin, Jr., primarily for personal usage and occasionally on business as an employee of Painting Co. This car was wrecked in 1962 and replaced with a 1956 Chevrolet, which was used in a similar manner. Petitioners claimed depreciation on the 1960 Chevrolet on the basis of its full cost over a 3-year life. Respondent did not allow any depreciation on this automobile on the ground that it was not used in the business. (3) 1958 Cadillac which cost $6,250 new on December 28, 1957. This automobile was used for personal purposes by petitioner and Kathryn until a second Cadillac was acquired in 1960, at which time it was converted primarily to business use. Petitioner claimed no depreciation on this car for any of the years involved. Respondent determined that the car was converted to business use in 1960, had a value of $3,750 as of *264 January 1, 1960, and a salvage value of $750, and had a 3-year remaining life at that time, and allowed a deduction for depreciation for each of the years 1960 through 1962 computed on that basis. (4) 1960 Cadillac which cost $8,349.68 new in February 1960. This car was used primarily for the personal use of Kathryn and the 1958 Cadillac was converted primarily to business use by petitioner after this car was acquired. This car was awarded to Kathryn in the divorce proceedings in 1962. Petitioners claimed depreciation on this car for each of the years 1960 through 1963 on the basis of full cost and a 3-year life. Respondent did not allow any depreciation on this car on the ground that it was used for personal and not business purposes. (5) 1961 Chevrolet sport coupe which cost $2,867.76 new in March 1961. Petitioners claimed depreciation on this car computed on the basis of full cost over a 3-year life. In his notice of deficiency respondent disallowed depreciation on this car as being for personal use, but conceded at the trial and on brief that petitioners are entitled to the depreciation claimed on this car. (6) 1960 3/4-ton Chevrolet truck which cost $2,217.31 new in October *265 1960. This truck was used in the business. Petitioners depreciated this vehicle over a 3-year life. Respondent determined that it had a useful life of 5 years and adjusted the allowable depreciation accordingly. (7) 1956 Chevrolet which cost $775 when purchased in February of 1962. This car was used by Wilbur Bolin, Jr., in the manner above described after his 1960 Chevrolet was wrecked. Petitioners claimed depreciation on this car on the basis of a 3-year life for 1962 and 1963, which respondent disallowed on the ground that it was used for personal purposes. Petitioner used the basement of his home at 2539 Regina Avenue, Columbus, Ohio, as an office for Painting Co. during the year 1960. On their return for 1960 petitioners claimed as a business expense of Painting Co. depreciation on one-half of the value of the home. Depreciation claimed was $462.59. They also claimed as an itemized deduction for 1960 one-third of the payments on the mortgage on this property, in the amount of $640. Respondent disallowed the $640 claimed as an itemized deduction; he also determined that the value of the basement room used as an office was $2,500, that it had a useful life of 40 years, and *266 allowed depreciation of $62.50 computed on that basis. Respondent also disallowed a deduction for interest claimed on petitioners' return for 1960 in the amount of $150 which was not identified either in the notice of deficiency or in the record. In his notices of deficiency for the years 1962 and 1963 respondent allowed petitioners an investment credit on certain equipment purchased by petitioners in those years for use in their business, which credit petitioners had not claimed on their returns. Respondent also reduced the basis of this equipment for depreciation purposes by the amounts of the investment credit allowed and adjusted depreciation claimed thereon accordingly. Painting Co. opened an account under Kathryn's name with the Bureau of Workmen's Compensation of Ohio in 1957. When the account was opened an advance premium deposit in the amount of $496 was paid by Painting Co. to the Bureau. On April 27, 1960, Painting Co. paid an additional advance premium deposit on this account to the Bureau in the amount of $2,234. This account was closed in October of 1961 and Painting Co. received a refund from this account in the amount of $2,614.08 in 1962. Painting Co. opened *267 another account under Wilbur's name with the Bureau on May 25, 1961, and paid an advance premium deposit on that account to the Bureau in the amount to the Bureau in the amount of $425 at that time. Painting Co. paid an additional advance premium deposit on that account on July 27, 1962, in the amount of $1,775. Rule XIII of the Industrial Commission of Ohio and Bureau of Workmen's Compensation provides as follows: RULE XIII Rule Controlling the Making of the Initial Application for Rating The amount of premium due from individual employers is ascertained by applying the basic rate for the occupation or employment in which the employer is engaged to the estimated expenditure of wages for the ensuing six months and also for an additional adjustment period of two months, that is, the advance estimate should be made for a period of eight months. Employers are required to file with the Commission and Bureau an application setting forth the name and address of the employer, the location of all places where employees are employed, a description of the work done or industry conducted at each such place, the estimated average number of employees in each kind of work, the estimated *268 total payroll for the ensuing six months, and an estimated total payroll for an additional adjustment period of two months, and such other information as may be requested by the Commission and Bureau. Upon receipt of the application, employment of the applicant will be classified and the applicant advised as to his classification, rate, and amount of his first premium, calculated on a basis of an estimated expenditure of wages for eight months in advance and at the same time he will be furnished with a pay-in-order authorizing the Treasurer of State to receive the amount of such premium. This advance premium deposit shall be retained as an adequate eight month premium deposit subject to a periodic review by the Commission and Bureau and any unearned portion of this deposit shall be returned to the employer upon cancellation of the coverage subject to audit. In his notice of deficiency for the year 1962 respondent determined that the deduction claimed by petitioner "for Workmen's Compensation Insurance should be adjusted to reflect refunds of deposits as follows: "Deposit refunded
$2,614.08
New advance deposit
1,775.00
Adjustment
$4,389.08"
In his notices of *269 deficiency respondent determined that petitioners were liable for the addition to tax under section 6653(a) of the 1954 Code (negligence or intentional disregard of rules and regulations) for each of the years 1959 through 1963. In his notice of deficiency for the year 1961 respondent determined that certain business expenses, totaling $3,043.80, claimed as deductions on petitioners' return for 1961, were capital expenditures advanced to start and incorporate a janitor service business which was abandoned in 1961; that these amounts were not deductible as business expenses in 1961, but were allowable as a capital loss instead; however, the amount of the capital loss allowable in 1961 was determined to be $1,000 because of the limitations of section 1211 of the Code. In his notices of deficiency for 1962 and 1963 respondent made no adjustment reflecting a carryover of the unallowed portion of the capital loss determined for 1961. In their petitions filed in these proceedings petitioners alleged error in respondent's disallowance of the expenditures totaling $3,043.80 as business expenses for 1961, but claimed no capital loss carryover for the years 1962 and 1963. In his opening *270 statement counsel for petitioners conceded that the items totaling $3,043.80 were not deductible as business expense in 1961 and were properly deductible as a capital loss, but claimed that the unallowable portion of the capital loss should be carried over into subsequent years. Opinion A number of the issues involved are factual and, unfortunately, petitioners have failed to produce sufficient evidence with respect to most of these issues to carry their burden of proving error in respondent's determinations, or for that matter to permit us to make findings of many facts relative thereto. Other issues raised in the pleadings and not conceded by either party have not been argued by petitioners on brief and we feel justified in assuming that they have been abandoned. Issues 1 and 2 Issue 1. Is assessment of the deficiency determined by respondent for the year 1959 barred by the statute of limitations? While this issue was raised separately in the petition, it was not argued separately by petitioners on brief, and we feel petitioners must be relying on their argument under Issue 2 to carry this issue. In any event the evidence is clear that while the notice of deficiency for *271 the year 1959 was mailed more than 3 years after petitioners' return for that year was due, the parties, prior to April 15, 1963, executed a valid consent extending the time for assessment of the tax due for 1959 to June 30, 1964, and the notice of deficiency for 1959 was mailed to petitioners on August 9, 1963, well within the extended period Under sections 6501(c)(4) and 6503(a)(1), [4] assessment of the tax due for 1959 is not barred by limitations. *272 Issue 2. Whether the deficiency in tax determined by respondent for the year 1959 is invalid because on alleged second examination of petitioner's books and records for that year was in violation of section 7605(b). On brief petitioners rely on the language of section 7605(b) and on the case of Reineman v. United States, 301 F. 2d 267, in arguing that an unauthorized reexamination of a taxpayer's books during the process of examining the books relative to a different tax year bars the assertion of a deficiency for the year reexamined. Section 7605(b) provides as follows: (b) Restrictions on Examination of Taxpayer. - No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary or his delegate, after investigation, notifies the taxpayer in writing that an additional inspection is necessary. We need not deal with all the possible ramifications that could be involved in an issue such as this, such as the effect of an unauthorized second examination of a taxpayer's records on the validity of the *273 notice of deficiency, whether the written memorandum given Wilbur by the special agent was sufficient notice within the meaning of the statute, etc., because petitioners have not shown by competent evidence that a second examination of the books for the year 1959 actually occurred, or that the deficiency determined for 1959 was based on a second examination of the books. Paragraph 4(b) of the petition in docket No. 4970-63, which presumably raises this ISSUE, ALLEGED ERROR IN RESPONDENT'S NOTICE OF DEFICIENCY IN THAT - The deficiency for the year 1959 was closed to further review by the Commissioner by an agreement between the taxpayers and the Commissioner as a result of an audit and additional assessment in December, 1960. Paragraph 5(b) of that petitioner alleges as the only supporting fact for the error alleged in paragraph 4(b): (b) The petitioners and respondent entered into an agreement on December 5, 1960 whereby further review for the year 1959 was closed. In his answer respondent denied both allegations. The only evidence presented in support of the above allegations is Wilbur's testimony that in 1960 a revenue agent did examine his books for 1959, proposed some *274 adjustments which resulted in additional tax being due, and that he paid the additional tax. The notice of deficiency also indicates, in the computation of additional tax for 1959, that the tax paid was as previously adjusted per report dated December 5, 1960. However, there is no evidence that there was any agreement entered into between the parties at that time which might serve as a closing agreement or which would otherwise preclude respondent from making further adjustments in petitioners' tax liability for 1959. Consequently, petitioners have not proved the allegations of the petition set out above. As said in William Fleming, 3 T.C. 974, 984: In the absence of a closing agreement, valid compromise, final adjudication, or the running of the statute of limitations, the Commissioner may make new and different assessments against the same taxpayer, for the same year, and in respect of the same type of tax. * * * But assuming that the above allegations do raise this issue as argued on brief, petitioners have still failed to prove that a second examination of their books occurred upon which the proposed deficiency for 1959 was based. Petitioner testified that sometime *275 in 1962 or 1963 a revenue agent called him and asked petitioner if he could see his books for the years 1961 and 1962 (probably 1960 and 1961), which were made available to the agent. At some unknown date a special agent gave petitioner the written memorandum referred to in our findings of fact, requesting certain records which would include records for 1959, which request petitioner refused to comply with. By not later than December 3, 1962, petitioner or his attorney had been advised of adjustments the revenue agent proposed to make in petitioners' tax liability for 1959, 1960, and 1961, and refused to agree to them. It was not until March of 1963 that petitioner was served with a summons to produce the above records, which summons was issued by the special agent in connection with an examination of petitioner's brother, James Bolin, and which summons he complied with. The only adjustment made in petitioners' income for the year 1959 was an increase in gross receipts due to the transfer of a house and lot owned by Eureka, in which James Bolin was part owner, to petitioners in part payment of an indebtedness owed by Eureka to Painting Co., and a payment by Eureka on the mortgage *276 on that property. Information to support this determination could have been obtained from various sources other than petitioner's books. In fact, petitioner testified that because there was some doubt concerning the value to be assigned to the property transferred, he made no entry on his books reflecting a credit to the account of Eureka because of the transfer. It seems more likely that respondent's agents happened on to this transaction in examining the books of Eureka, which would at least justify them in going back to take another look at petitioner's books for 1959. The evidence is not clear whether petitioner knew that the revenue agent was going to look at his books again with reference to this 1959 transaction; petitioner was uncertain about it in his testimony; but at some time prior to March 1963, petitioner was given the undated written notice referred to above asking for a record of his accounts receivable from Eureka for the period 1955 to 1960 and petitioner was also advised that the revenue agent was considering making an adjustment for this transaction in 1959. There is no evidence that the revenue agent had access to petitioner's books for 1959 until after he had *277 proposed certain adjustments to petitioners' taxable income for 1959, 1960, and 1961. Petitioner or his attorney was advised of these proposed adjustments by early December 1962, and the summons for his records was not issued until March of 1963; and then in connection with an audit of James Bolin's returns. We do not know what adjustments the agent proposed for 1959 but they could have included, and in all likelihood did include, the adjustments made in the deficiency notice. We think it is pretty clear that the revenue agent was justified in checking this transaction, which would not have been apparent from petitioner's books when they were originally examined, that petitioner probably knew the agent was checking this item and made no objection thereto, and that if respondent's agent did actually conduct what would qualify as a second examination of petitioner's books and records for 1959, petitioner was notified thereof and waived any objection thereto. See M. O. Rife, Jr., 41 T.C. 732, modified 356 F. 2d 883; William H. Parsons, 43 T.C. 378. In Reineman v. United States, supra, relied on by petitioners, the Court found that *278 the taxpayer had no knowledge that his books for the prior year were being reexamined or that adjustments in his tax liability for that year were being considered until after he received a 10-day letter, and had no remedy to correct the illegal action taken by the Commissioner unless the notice of deficiency was declared invalid. That case is factually distinguishable from this case and is not controlling. We cannot find on the evidence before us that respondent violated the provisions of section 7605(b) by conducting an unnecessary second examination of petitioner's books without notice. Nor can we find on the evidence that the conduct of the Internal Revenue Service was in violation of petitioners' rights under the Fourth Amendment to the Constitution, as mentioned by petitioners. Issue 3. Whether petitioners received additional income as a result of a transfer of a residence to them and payments on a mortgage on the property made by Eureka in part payment of an indebtedness from Eureka to Painting Co. Petitioners argue on brief that the contract between petitioners and Eureka calling for a transfer of the residential property to petitioners in part payment of the indebtedness *279 was entered into in 1958, that the fair market value of the property should be determined as of 1958, and that if any income was realized by petitioners from this transaction it was taxable in 1958. Petitioners offered no evidence of the value of the house in 1958 or any other time. It is clear that the transaction was closed and the property was transferred to petitioners by Eureka in March 1959, in part payment of indebtedness due Painting Co. by Eureka for past services rendered. Wilbur agreed with Eureka that the value of the property for this purpose was $26,000. The property was apparently subject to a $19,500 mortgage which Wilbur had to assume, so Wilbur realized an economic benefit of $6,500 as a result of the transaction in 1959. There is no evidence that it was intended that the contract or agreement itself, which was dated in 1958, was accepted by Wilbur as part payment on the indebtedness so as to be income to him or Painting Co. in 1958. Petitioners offered no evidence or arguments with respect to respondent's determinations that petitioners received additional business income in the amounts of $570.18 and $219.25 in 1959 and 1960, respectively, as a result of payments *280 made by Eureka on the mortgage on petitioners' residence in part payment of a business indebtedness. We conclude that petitioners have failed to carry their burden of proving error in respondent's determinations, and hold for respondent on this issue. Issue 4. Whether funds received by General Painting Co. should be included in income in the year of receipt, rather than in the year deposited. Respondent determined that, in order to place petitioners on a true cash basis, certain checks and/or cash, representing business receipts, received by Painting Co. near the end of the years 1960, 1961, 1962, and 1963, but not deposited by it in its bank account until the succeeding years, should properly be included in petitioners' income for the years of receipt rather than the following years, as reported by petitioners. Respondent also reduced petitioners' income for the years 1961, 1962, and 1963 by the amounts erroneously included in income by petitioners for those years but pushed back by respondent into the preceding years. Petitioners do not argue that respondent erred in making the adjustments he did make, nor do they question the amounts thereof, but they do claim that a similar *281 adjustment should be made for the receipts on hand at the beginning of the year 1960. We agree with petitioners' claim but we have no evidence of what the receipts on hand at the beginning of 1960, if any, might be, or that they were included in the income reported by petitioners in 1960. The burden of proof was on petitioners and we must hold for respondent on this issue for petitioners' failure to carry that burden. It is no answer to say, as argued by petitioners on brief, that because petitioners followed the above practice consistently the adjustments should not be made. Issue 5. Depreciation on automobiles, and disallowance of business expenses for personal use of automobiles. Respondent made adjustments in the depreciation allowable to petitioners for automobiles used in the business, as set out in our findings of fact, disallowing all depreciation claimed on some vehicles because they were not used for business purposes, and adjusting the depreciation allowable on others by reducing their basis for depreciation by salvage value and extending their useful lives. Petitioners offered very little evidence with respect to the basis for depreciation of the automobiles involved *282 or their useful lives in the business, and the presumptive correctness of respondent's determinations thereof must stand. The main thrust of petitioners' evidence was to prove that the automobiles determined by respondent to have been used for personal purposes only were used, in part at least, in the business. Two sets of automobiles are involved in this argument, which involves only the years 1960 and following. Petitioners claimed depreciation on the 1960 Cadillac for the years 1960 through 1963 and claimed no depreciation on the 1958 Cadillac in any of the years 1960-63. Respondent allowed depreciation on the 1958 Cadillac for each of the years 1960-62, but allowed no depreciation on the 1960 Cadillac. The other set of automobiles involved was the 1960 Chevrolet Biscayne driven by Wilbur Bolin, Jr., until it was wrecked in early 1962, and the 1956 Chevrolet he drove thereafter. Petitioners claimed depreciation on the 1960 Chevrolet for 1960, 1961, and part of 1962, and claimed depreciation on the 1956 Chevrolet for part of 1962 and for 1963. Respondent did not allow depreciation on either of these automobiles. Petitioner testified that in 1960 his wife drove the 1958 Cadillac *283 and that he drove the 1960 Cadillac, mostly on business but sometimes for personal use; that in 1961 his wife made increased demands for use of the 1960 Cadillac and she used it 50 percent of the time and he alternated using the 1958 and the 1960 Cadillacs for business purposes; and that in 1962 after his wife was awarded the 1960 Cadillac in the divorce proceedings he drove the 1958 Cadillac exclusively. We are inclined to accept petitioner's testimony, except possibly as to the extent Kathryn used the new car in 1960, but the evidence is not specific enough to justify changing respondent's determinations with respect to these two automobiles. Respondent allowed no depreciation on the 1960 Cadillac, which of course had a higher depreciable basis in 1960 than did the 1958 Cadillac, but he allowed full depreciation on the 1958 Cadillac despite the fact that Wilbur admittedly used the car he was driving partially for personal purposes. Petitioner's own testimony does not support the right to claim full depreciation on the 1960 Cadillac for 1961 or the right to claim any depreciation on that car for 1962 and 1963. We sustain respondent's determinations with respect to these two automobiles. *284 The two Chevrolets driven by Wilbur Bolin, Jr., were owned by Painting Co. and both petitioner and Wilbur, Jr., testified that he used them partially on business and partially for personal use. While the evidence is not very specific, we believe it supports a finding that 25 percent of the use of these two cars was in the business of Painting Co., and we so find. Petitioners are entitled to deduct 25 percent of the depreciation claimed on these two Chevrolets for the years involved. Respondent disallowed a flat amount of $1,000 in business expenses claimed by petitioners for each of the years 1960 through 1963 on the ground that this represented the cost of operating two automobiles not used in the business but paid for by Painting Co. and claimed as a business expense for each of those years. This represents $500 for each of two cars, presumably those driven by petitioner's wife and son. While we think these amounts might be high, when depreciation is not included, there is no evidence of the number of miles driven, etc., to refute it. Petitioners also claim that Wilbur, Jr., paid all of the cost of operating the cars he drove himself; but when, on cross-examination, Wilbur, Jr. *285 , was presented with numerous gasoline station bills signed by him and charged to Painting Co. within a relatively short period, Wilbur, Jr., was not so sure of this. Nevertheless, we think petitioners have offered sufficient evidence to show that the amounts disallowed by respondent were too large. Using our best judgment, based on all the evidence, including the evidence that Wilbur, Jr., used the car he drove partially on company business, and the evidence that Wilbur and Kathryn were divorced in 1962 and it is doubtful that the expenses of operating her car were paid by Painting Co. thereafter, we conclude that the proper amounts to be disallowed as business expenses for this reason were $750 for each of the years 1960 and 1961, and $500 for each of the years 1962 and 1963. Issue 6. Deductions for interest in amount of $150 and mortgage payments on residence in amount of $640 for 1960. Petitioners offered no evidence with reference to the interest deduction disallowed by respondent and did not mention it on brief, so we assume they have abandoned this issue. In any event they have failed to carry their burden of proving respondent's determination to be in error. We hold for *286 respondent with respect to this item. Petitioners appear to have deducted as an itemized deduction one-third of the payments made on the mortgage on their residence at 2539 Regina Avenue in 1960, presumably on the theory that one-third of the house (the basement) was used as an office for the business. They also claimed itemized deductions for one-third of the utility bills paid during the year, which respondent did not disallow. While petitioners admittedly used the basement of their residence as an office during 1960, payments on the principal of the mortgage would be capital expenditures and not deductible as business expense. Respondent has allowed depreciation on what he determined to be the cost or value of the basement and improvements used in the business. Petitioners offered no evidence on this issue and did not mention it on brief. We hold for respondent on this issue. Issue 7. Adjustment to basis for depreciation of equipment purchased for use in business because of allowance of investment credit. Petitioners did not claim the investment credit for certain equipment they purchased for use in their business in 1962 and 1963, but claimed depreciation on the full cost *287 thereof. [5] Respondent computed the investment credit provided for in section 38 of the Code, effective for 1962 and 1963, allowed it as a credit against the tax, and reduced petitioners' basis for depreciation of these assets by the amount of the investment credit allowed. Petitioners do not specifically challenge these adjustments on brief and presented no evidence with respect thereto. Petitioners have shown no error in respondent's computation on this issue and we hold for respondent on it. See secs. 38, 46, and 48(g), effective for years 1962 and 1963, and regulations relative thereto. Issue 8. Deductibility of advance premium deposit to Bureau of Workmen's Compensation of Ohio in 1962 and inclusion in income in 1962 of refund of advance premium deposits paid in prior years. In his notice of deficiency for 1962 respondent determined that petitioner's "deduction for Workmen's Compensation Insurance should be adjusted to reflect refunds *288 of deposits as follows: "Deposit refunded
$2,614.08
New advance deposit
1,775.00
Adjustment
$4,389.08" The amount of $4,389.08 was added to petitioner's taxable income for 1962. The evidence indicates that Painting Co. opened an account with the Bureau of Workmen's Compensation of Ohio in Kathryn's name in 1957 and made an advance premium deposit of $496 in that year, and made an additional deposit to this account of $2,234 in 1960. Petitioner was apparently advised that it would be more economical for him to close this account and open a new one. As a result a new account was opened in his name in May of 1961, at which time petitioner paid to the Bureau an advance premium deposit of $425 on this new account, and paid an additional $1,775 on the new account in 1962. The old account was canceled in October 1961 and petitioner received a refund of the unused balance in the first account, in the amount of $2,614.08, in 1962. We are unable to determine from petitioners' income tax returns or from any evidence presented whether petitioner deducted these deposits in the years they were paid to the Bureau. Respondent has determined that the $1,775 paid in 1962 was erroneously *289 deducted by petitioner and, absent evidence to the contrary, we must assume that that payment was deducted by petitioner in 1962. Respondent has made no determination on this point with respect to the $2,614.08 refunded in 1962. Respondent argues on brief that the advance premium deposits are returnable and are not used to pay premiums due, except possibly upon cancellation of the coverage or when an advance deposit is shown to be excessive, at which time the excessive portion may be applied against unpaid premiums; therefore, he argues, the deposits are not deductible when made, but only when applied to pay premiums. He also argues, with respect to the $2,614.08 refunded, that inasmuch as petitioner deducted the $1,775 when paid in 1962 it must be assumed, absent evidence to the contrary, that petitioner deducted all amounts deposited in the first account when deposited. Petitioner does not mention the $2,614.08 refund item on brief but argues only that the deposit of $1,775 in 1962 was a premium for insurance and is deductible as an ordinary business expense in the year paid. Presumably petitioner acknowledges that a refund of any unused premium deposit is includable in income, *290 and we consider that petitioner has abandoned his objection to the inclusion of the $2,614.08 refund in income for 1962. [6]
We cannot determine with any degree of certainty, from the evidence presented, just what the purpose of these advance premium deposits is, how they are used, or what the rights of the contributor in the deposit are at any particular time. The only evidence presented was a certified copy of Rule XIII of the Bureau, which we have set out in our findings of fact, and the somewhat confusing testimony of an employee of the Bureau called as a witness by respondent. The most we can determine from this evidence is that the employer is called upon to make an advance premium deposit, based on his estimated payroll for 8 months, when he first applies for coverage, that the deposit is not normally *291 applied to payment of the premium for coverage but may be so applied if the deposit becomes excessive or upon cancellation of coverage, and that any balance of the deposit not so applied is refundable to the employer upon cancellation of coverage. Based on the evidence we have before us we cannot conclude that respondent's determination with respect to the $1,775 payments in 1962 is erroneous; and we hold for respondent on this issue because petitioner has failed to carry his burden of proving that respondent was in error. However, this shall not be interpreted as a ruling on the deductibility of these advance premium deposits as a matter of law. That is a question of some importance about which there are conflicting views, see e.g., United States v. Weber Paper Co., 320 F. 2d 199 (affirming 204 F. Supp. 394, W.D. Mo. 1962), and Rev. Rul. 60-275, 1960-2 C.B. 43, and should be left for determination when all the facts are before the Court. Issue 9. Additions to tax under section 6653(a). In his notices of deficiency respondent determined that additions to tax under section 6653(a) were due from petitioners for each of the years 1959 through *292 1963. Under section 6653(a) [7] an amount equal to 5 percent of the underpayment of income tax is added to the tax where any part of the underpayment is due to negligence or intentional disregard of rules and regulations (but without intent to defraud). In order for petitioners to prevail on this issue it is incumbent upon them to introduce evidence to rebut the presumption of correctness which attaches to respondent's determination. James W. England, Jr., 34 T.C. 617. This they have failed to do. Consequently, we must approve respondent's determination on this issue, although somewhat reluctantly. It would appear that inasmuch as we have approved respondent's determination *293 that certain expenditures made by petitioners with respect to a janitor service business gave rise to a capital loss in 1961, only $1,000 of which was deductible in 1961, under section 1211(b) of the Code a capital loss carryover should be available for deduction by petitioners, within the limits provided by the Code, in subsequent years. Respondent did not allow any such deductions in his notices of deficiency for 1962 and 1963. The parties are instructed to reflect any allowable deductions by virtue of this loss in their Rule 50 computations for 1962 and 1963. To reflect the concessions made by the parties, adjustments resulting from our disposition of the questions presented, and the resulting necessary adjustments in medical expense deductions. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Wilbur F. Bolin and Damiris M. Bolin, docket No. 4742-65, and Wilbur F. Bolin, docket No. 4743-65.↩
2. All section references hereinafter are to the Internal Revenue Code of 1954 unless otherwise noted.↩
3. References herein to petitioner's business and business activities refer to the business of General Painting Co. unless otherwise indicated.↩
4. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * *
(c) Exceptions. - * * *
(4) Extension by agreement. - Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary or his delegate and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon. SEC. 6503. SUSPENSION OF RUNNING OF PERIOD OF LIMITATION. (a) Issuance of Statutory Notice of Deficiency. - (1) General rule. - The running of the period of limitations provded in section 6501 or 6502 on the making of assessments or the collection in section 6501 or 6502 on the making of assessments or the collection by levy or a proceeding in court, in respect of any deficiency as defined in section 6211 (relating to income, estate, and gift taxes), shall (after the mailing of a notice under section 6212(a)) be suspended for the period during which the Secretary or his delegate is prohibited from making the assessment or from collecting by levy or a proceeding in court (and in any event, if a proceeding in respect of the deficiency is placed on the docket of the Tax Court, until the decision of the Tax Court becomes final), and for 60 days thereafter.↩
5. It appears from the depreciation schedule attached to petitioners' return for 1963 that petitioners did not claim depreciation on some of this equipment in 1963. However, respondent allowed a deduction for it in his notice of deficiency.↩
6. It is not clear why, with the years 1960, 1961, and 1962 all before us, respondent did not disallow deduction of the amounts of the advance premium deposits paid in 1960 and 1961 rather than add the refund received in 1962 to income, unless it is because those years were covered by a different notice of deficiency than was the year 1962. Petitioners make no issue of this.↩
7. SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations With Respect to Income or Gift Taxes. - If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.↩