**WEBER PAPER COMPANY, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 12934-2.

United States District Court W. D. Missouri, W. D.

April 18, 1962.

John B. Gage, Elmer B. Hodges, Kansas City, Mo., for plaintiff.

William A. Kitchen, Asst. U. S. Atty., Kansas City, Mo., George Hrdlicka, Washington, D. C., for defendant.

GIBSON, District Judge.

This matter came on for trial before the Court without a jury on November 20–21, 1961 on a complaint filed by plaintiff by which plaintiff seeks a refund on its corporate income taxes paid by it for the taxable years of 1956, 1957, and 1958. The sole issue in the case is whether certain amounts deducted by plaintiff as ordinary and necessary business expenses qualified as such and were "insurance premiums" as defined by Section 162 of the Internal Revenue Code of 1954, 26 U.S.C. § 162 and the regulations issued pursuant thereto. The Court, having considered the stipulations, briefs, and the evidence in this case, makes the following:

*Findings of Fact*

1. Jurisdiction of this cause, which arises under the Internal Revenue laws of the United States, is conferred by Title 28 U.S.C. § 1346(a) (1).

2. Plaintiff is, and was at all times during the taxable years involved and thereafter to the time of the trial, a corporation, organized under the laws of the State of Missouri, with its principal place of business in Kansas City, Missouri, within the Western District of Missouri.

3. Plaintiff, since prior to July 13, 1951, has been engaged in the sale of paper and paper products, and allied lines, carrying on its business in Kansas City, Missouri in the area known as the Central Industrial District. In the flood of the Kaw and Missouri rivers, which occurred on or about July 13, 1951, its

premises, located in the immediate vicinity of the present business premises of the plaintiff, were inundated to a depth of approximately twenty feet, and plaintiff sustained a loss of approximately $90,000.00, as a proximate result thereof through damage to its inventory of paper and paper products.

4. In its income tax returns for the calendar years 1956, 1957 and 1958, the plaintiff deducted, as ordinary and necessary business expenses, premium deposits paid by it in the amounts of $5,277.55, $4,722.45 and $4,166.65, respectively, under a policy of insurance against loss by flood. Payment of the premium deposits and the correctness of their allocation to the respective taxable years is stipulated.

5. Upon examination of the plaintiff's returns, the Commissioner of Internal Revenue disallowed the major portion of the premiums so deducted, the amount disallowed for 1956 being $5,224.78, the amount disallowed for 1957 being $4,622.45, and the amount disallowed for 1958 being $4,024.88.

6. As a result of the above disallowances, together with corresponding adjustments in contributions claimed by the plaintiff in the years 1957 and 1958, additional taxes and interest were assessed by the Commissioner and paid by the plaintiff as follows:

| Year | Amount Assessed | Date | Amount Paid | Date |
|------|-----------------|--------|-------------|---------|
| 1956 | $3,200.38 | 4–8–60 | $3,200.38 | 4–21–60 |
| 1957 | 1,472.79 | 4–8–60 | 1,472.79 | 4–21–60 |
| 1958 | 1,213.57 | 4–8–60 | 1,213.57 | 4–21–60 |

The plaintiff filed timely claims for refund of the above amounts plus interest, which were disallowed by the Commissioner on June 27, 1960, and the present action was thereafter timely instituted for their recovery.

7. The deductions so disallowed by the Commissioner of Internal Revenue represent amounts paid by the plaintiff to Flood Insurance Associates, Inc., as Attorney-in-Fact for the Subscribers of National Flood Underwriters, a reciprocal inter-insurance exchange, licensed to conduct an inter-insurance underwriting business in the states of Missouri and Kansas, pursuant to the statutes of said states respectively.

8. On July 13, 1957, there was issued to National Flood Underwriters by the State of Missouri a Certificate of Authority to transact business of fire, allied lines, and flood insurance on the reciprocal and inter-insurance plan. Since that date, National Flood Underwriters has been continuously so authorized to transact such business by the State of Missouri, to the present time. On October 17, 1958, a Certificate of Authority was issued to National Flood Underwriters by the State of Kansas, authorizing it to transact business within that State as an inter-insurance exchange. National Flood Underwriters has been continuously so authorized by the State of Kansas from said date to the present time.

9. Flood Insurance Associates, Inc., a corporation, incorporated under the laws of the State of Missouri on December 7, 1955, was designated as Attorney-in-Fact for the Subscribers to National Flood Underwriters, and at all times here involved was acting in that capacity; and it has maintained the Guaranty Fund deposited with the Division of Insurance of the State of Missouri as required by the statutes of said state relating to reciprocal or inter-insurers.

10. On June 21, 1956, the plaintiff, through Flood Insurance Associates, Inc., Attorney-in-Fact for subscribers as pro-

vided by the statutes of the State of Missouri relating to reciprocal or inter-insurance, submitted to National Flood Underwriters its application to become a subscriber and to exchange insurance with other subscribers against flood losses, up to the amount of $100,000.00. With said application plaintiff tendered its check in the sum of $1,000.00, being 10 per cent of the first annual premium deposit, agreeing to pay the balance of said first annual premium deposit in the amount of $9,000.00, upon issuance and delivery to it of the policy referred to in said application. The $1,000.00 paid was deposited with an escrow agent to be delivered to Flood Insurance Associates, Inc., Attorney-in-Fact for Subscribers to National Flood Underwriters, upon receipt of evidence that such inter-insurance exchange had been duly licensed and authorized to transact business as such in the States of Missouri and Kansas.

11. At the time of submission of the said application for insurance, plaintiff also executed a document or power of attorney entitled "Subscriber's Agreement."

12. On July 15, 1957, the Subscribers at National Flood Underwriters, through Flood Insurance Associates, Inc., Attorney-in-Fact for the plaintiff and the other subscribers at said exchange, issued to plaintiff Policy No. 102 of National Flood Underwriters, insuring it against loss by flood in the amount of $10,000.00. Plaintiff thereupon paid to National Flood Underwriters the remainder of the annual premium deposit as required by its application for the insurance. On or about August 15, 1958, an additional premium deposit in the amount of $10,000.00 having been made by plaintiff, an endorsement was attached to said policy No. 102 increasing the coverage to $20,000.00.

13. As to the form and general provisions, the Flood insurance policy so issued to plaintiff was to some extent derived from, and was similar to the form of policy of insurance in general use in the reciprocal or inter-insurance field, which was known as the "New York No. 1 Form", but with changes to adapt it to the flood insurance type of risk, insurance solely against floods not having theretofore been written by other insurance organizations, either reciprocal or so-called "old line" stock insurance companies. The clause of the policy relative to its cancellation was derived without change from the New York No. 1 form of reciprocal insurance policy.

14. The provisions of Paragraph 13 of the Subscriber's Agreement executed by the plaintiff relative to termination of the contract and limitation of accrual of liability against the Subscriber after termination was copied verbatim from the subscriber's agreement form in use by Lumbermen's Underwriting Alliance, a large reciprocal inter-insurance organization, in writing fire insurance, the latter being a rather typical subscriber's agreement.

15. After the incorporation of Flood Insurance Associates, Inc. on December 7, 1955, a plan for the operation of a reciprocal or inter-insurance exchange under the name of National Flood Underwriters was submitted to the Commissioner of Insurance of Missouri, with an application for license as such exchange. This plan was approved after due consideration, and a license as a reciprocal or inter-insurer was issued.

16. In order to insure the solvency of an underwriter of Flood Insurance, the Division of Insurance of the State of Missouri required the constant maintenance of reserves equal to the face amount of all policies in force. The 100 per cent reserve requirement was unique to the National Flood Underwriters' program but was imposed because of the nature of the risk involved and the fact that no other insurance company, group, agency or other entity had successfully been able to evolve a workable policy or program insuring against flood losses.

17. The Subscriber's Agreement gave to the Attorney-in-Fact the right to

classify subscribers in accordance with the nature of their business, flood hazard, location, flood district, or their loss experience.

18. The Attorney-in-Fact was authorized to collect from each subscriber annually a premium deposit, the amount of which should not be in excess of the amount of additional insurance coverage applied for and placed in effect in the year to which the payment should apply. The full amount of such premium deposit, when and as made, was required to be credited to the catastrophe loss account maintained in the name of the subscriber, subjected to charges, pro rata, for payment of flood losses of the similarly classified subscribers, and costs of reinsurance, if any. The attorney-in-fact was required to debit the catastrophe loss account in each year when an annual premium deposit is made, an amount equal to 1 per cent of the amount of the insurance coverage currently in effect, which amount was to be credited to and placed in and become a part of a General Reserve Fund subject to use, if the Catastrophe Loss Account proved insufficient, for payment of losses on risks of similarly classified subscribers whose insured properties or business were located in the same flood district as the Subscriber's.

19. The funds credited to the Catastrophe Loss Accounts and General Reserve Fund were required to be invested from time to time by the Attorney-in-Fact, as directed by an advisory investment committee elected by the subscribers, the funds of all subscribers constituting a common fund for this purpose.

20. No reinsurance was available or purchased and no flood losses were suffered by subscribers during the tax years 1956, 1957 and 1958. In fact, no subscriber covered by the National Flood Underwriters program has suffered a flood loss since the inception of the program to the present time.

21. The Subscriber's Agreement and the provisions of Section 375.790 RS Mo1959, V.A.M.S. gave the Attorney-in-Fact the right, with the consent of the Advisory Committee of the Subscribers, to call on each subscriber for an amount not exceeding one annual premium deposit to pay excess losses incurred under the contract and the subscriber was obligated to pay such amount on call. This is a provision required by the statutes of Missouri and Kansas governing reciprocal or inter-insurance exchanges.

22. At the close of each fiscal year of operation of National Flood Underwriters, the unencumbered balance remaining of investment earnings was required to be credited on a pro-rata basis to the Catastrophe Loss Accounts of the Subscriber and to the General Reserve Fund. Such earnings were, however, subject to deduction for payment of the expenses of operation and compensation of the Attorney-in-Fact.

23. The credit balance in the Catastrophe Loss Account of a Subscriber was not under the control of the Subscriber and was not subject under the terms of the Subscriber's Agreement to withdrawal by the Subscriber except upon sixty (60) days' prior written notice effective immediately after the end of the current policy year for which premiums were paid to the exchange. In practice, however, the Subscribers were allowed to withdraw prior to the contract dates in order to secure funds with which to pay the tax deficiencies assessed by reason of the disallowances which formed the basis of this suit. In the event of such withdrawal, the Subscriber's credit in that account was required to be adjusted to reflect the then average market value of investments owned by the reciprocal insurance exchange. Under the plan of insurance shown in evidence, a subscriber and policyholder who sustains a flood loss, will be reimbursed for the amount of the loss to the extent of the policy coverage out of pro-rata debits to the combined Catastrophe Loss Reserve Account of himself and all other similarly classified subscribers;

and thereafter, in the event of termination of his participation in the plan, which can only occur after the end of his policy year, will be entitled either to withdrawal of an amount equal to his then credit balance in his Catastrophe Loss Reserve Account (adjusted to reflect the then values of the securities in which it is invested), or the use of the balance to effect additional policy coverage, and thus the subscriber may realize a total recovery through paid losses or eventual refunds or credits, substantially in excess of the premiums he had paid to the exchange. On the other hand, if losses are sustained, not by this subscriber but by other subscribers, with whom,—through the Attorney-in-Fact, he has exchanged inter-insurance, his Catastrophe Loss Reserve Account will have been charged with a pro-rata share of the losses sustained by the other subscribers and the cost of reinsurance purchased, if any, so that the amount eventually to be recovered by him upon withdrawal from the plan will be substantially less than the amount of the premium deposits which he has paid to the Exchange.

24. Under the flood insurance program of National Flood Underwriters, all subscribers were classified initially, for purposes of paragraph 7 of the Subscriber's Agreement, according to the flood district in which they were located; those in the Central Industrial District in which plaintiff was located, being plaintiff; Wilweb Investment Company, Inc., a real estate holding company, owning the building in which plaintiff carried on its business; Sutherland Lumber Company, which carried on a retail lumber business at its retail lumber yard located approximately ten blocks from the building in which plaintiff's business was carried on; and Kaw Valley State Bank of Kansas City, Kansas, located approximately ten blocks northwest of plaintiff's place of business. All of the Central Industrial District of Kansas City in which these subscribers were located, was inundated to a substantial depth in the floods of June 1903 and July 1951, Central Industrial District is one of the seven flood districts of the Greater Kansas City area protected by separate levee systems.

25. Upon payment by plaintiff to Flood Insurance Associates, Inc., Attorney-in-Fact for National Flood Underwriters, of the flood insurance premium deposits here in question, such premiums passed beyond its possession and control, and such payment constituted the "expenditure" of such sums by plaintiff. Such expenditures were directly connected with and pertaining to the trade or business of taxpayer, and the making of such expenditures and the securing of insurance protection against casualty risks such as was here sought by plaintiff, is ordinary and necessary in the carrying on of trades or businesses such as that of plaintiff. The amounts so paid were in fact insurance premiums against loss by flood to the property insured.

26. In all mutual insurance companies, of whatever character, including especially reciprocal or inter-insurance exchanges which are frequently operated to provide insurance in situations where the risk is such that the margin between probable losses and those reasonably possible is exceptionally wide, it is invariably the practice to collect premiums substantially in excess of the losses expected during the current policy term, since this excess constitutes the guaranty fund out of which extraordinary losses may be met, while in old line or stock companies such extraordinary losses may be met from the capital and surplus of the company. In all such mutual companies, it is expected that there will eventually be a return to the policyholder of the portion of the premium representing the difference between the losses and expenses actually sustained and the amounts of the premium deposits collected to meet such losses and expenses and to provide the guaranty fund to meet extraordinary losses, this difference sometimes being referred to as the "re-

dundancy" of the premium deposit. This redundancy varies greatly in various types of insurance, but it has been generally recognized, especially since the opinion rendered in 1920 by Mr. Justice Brandeis in Penn Mutual Life Insurance Company v. Lederer, 252 U.S. 523, 40 S.Ct. 397, 64 L.Ed. 698, that this redundancy may in some fields of insurance run exceptionally high, said opinion citing as an example the manufacturers' mutual fire insurance companies of New England where such redundancy rises often to 90 per cent or more of the premium paid. In the many years since that decision the deductibility of premiums paid for insurance secured from mutual companies has not been denied because of the redundancy feature. This practice was recognized, and restated as recently as Rev.Rul. 60–275, C.B. 1960–2, pp. 43, 45, in which this attitude of the Internal Revenue Service in permitting the deductibility of such premiums, even though redundant, was stated in the following language:

> "The Internal Revenue Service has taken the position that amounts paid by policyholders as premiums to a mutual insurance company are deductible even though there is a likelihood that a portion of the premium paid may be returned to them by the company. See G.C.M. 10,798, C.B. XI–2, 58 (1932), and I.T. 2646, C.B. XI–2, 59 (1932)."

27. The risks inter-insured through National Flood Underwriters in its policies of flood insurance were limited to situations where there was an actual exposure to risk of flood, and did not exceed the extent of such exposure. The premium deposits made by plaintiff herein were made in good faith to secure a spreading of the risk of loss among itself and the other subscribers at the exchange.

28. Under the Missouri statutes relating to reciprocal or inter-insurance and the construction of such statutes by the Division of Insurance of Missouri,

after cancellation or termination of the policy, the premium deposits of a subscriber held in reserve accounts of the reciprocal exchange continue to be subject to a pro rata debit for any and all losses sustained under policies of inter-insurance written by the exchange during the period his policy was in force and effect. Cancellation upon five days' notice as provided for in the policy terminates liability upon the policy issued to the subscriber and revokes the right or power of the Attorney-in-Fact to include the subscriber as an insurer on policies subsequently issued by the exchange, but, to the extent of his premium deposit held in such reserves, does not relieve the subscriber from his liability as an insurer with respect to losses thereafter occurring under policies written and in effect prior to such termination or cancellation of the subscriber's policy.

### Conclusions of Law

1. This is a civil action arising under the Internal Revenue Code of 1954. The Court has jurisdiction of the subject matter and the parties to the action.

2. The amounts paid by plaintiff to National Flood Underwriters as insurance premium deposits under Policy No. 102 issued by National Flood Underwriters, and allocated to the several taxable years as follows—1956, $5,277.55; 1957, $4,722.45; 1958, $4,166.65—were insurance premiums expended in connection with plaintiff's trade or business, and as such constituted ordinary and necessary expenses of plaintiff in carrying on its trade or business during said taxable years, and were therefore allowable as deductions from gross income of the respective years under the provisions of Section 162 of the Internal Revenue Code and the Regulations issued thereunder.

3. The conclusions contained in Rev. Rul. 60–275, C.B. 1960–2, p. 43, that the premiums paid by the taxpayer under this plan of reciprocal insurance are "amounts set aside by a taxpayer as a reserve for self insurance", and that such

a premium deposit "represents a non-deductible contingent deposit to the extent it is withdrawable by the taxpayers"—are not consistent with the facts disclosed in the case at bar. This is because they are based on the erroneous or irrelevant assumptions that there could be no real sharing of the risks because the occurrence of a major flood "probably would affect all properties in a particular flood basin"; that each subscriber is substantially underinsured; and the non-sequitur that any proceeds received by the taxpayer in the event of flood damage would, therefore, in effect, be a return of the taxpayer's own money. Such conclusions are also inapplicable to the case at bar since they ignore the fact that the deposits pass from the control of the taxpayer, and that no portion thereof can be withdrawn by the taxpayer during the policy year in which they are paid. Since the facts assumed in said ruling are inconsistent with the operation of the inter-insurance plan shown by the evidence in this case and the findings of fact contained herein, said Rev.Ruling 60–275 does not constitute a correct interpretation of the law applicable to this case and should not be followed herein.

4. The plaintiff is entitled to recover from the defendant sums equal to the income taxes erroneously and illegally assessed and collected from plaintiff for the years 1956, 1957, and 1958 as deductible expenses of plaintiff in computing its net income for said years respectively, together with interest as provided by law at the rate of 6 per cent per annum from the date of payment of the amounts so erroneously and illegally assessed and collected.

5. Entry of judgment shall be made in accordance with these findings of fact, conclusions of law and the opinion of the Court filed herein.

IT IS SO ORDERED.