BLACK HILLS CORPORATION, D.B.A. BLACK HILLS POWER AND LIGHT COMPANY, AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT *

Docket No. 8248–91.          Filed March 29, 1994.

---

* On Aug. 3, 1993, this Court filed its previous opinion in this case at 101 T.C. 173.

*George R. Abramowitz, Steuart H. Thomsen, Dennis L. Allen,* and *Diana E. Buckley,* for petitioner.

*Judy Jacobs Miller* and *Diane D. Helfgott,* for respondent.

### SUPPLEMENTAL OPINION

HALPERN, *Judge*: Our report in this case was filed on August 3, 1993, and decision entered on August 5, 1993. Our report is set forth at 101 T.C. 173 (1993). Petitioners have timely moved (1) for reconsideration of our opinion and findings of fact and (2) to vacate our decision. Rules 161 and 162, respectively.[1] Respondent has filed a response to petitioners' motion for reconsideration. Petitioners have filed a reply thereto. We have reconsidered those findings of fact that petitioners have asked us to reconsider. We agree with petitioners that a single finding was erroneous and revise that finding as set forth below. We revise our opinion accordingly. For the reasons set forth below, we see no reason to revise our decision.

## *Background*

### *Previous Report*

Petitioner Wyodak Resources Development Corp. (petitioner) is a mining company that, during the years in issue, operated a surface coal mine in Wyoming. As described in our previous report, petitioner (1) is subject to claims for compensation on account of black lung or other occupational

---

[1] Unless otherwise noted, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue.

diseases incurred by miners employed by petitioner, and (2) has obtained a policy from Security Offshore Insurance, Ltd. (SOIL) indemnifying it against losses on account of such claims. In our previous report, we stated the issues for consideration as: (1) Whether purported insurance premiums paid by petitioner were payments for "insurance", and (2) if so, whether such payments were ordinary and necessary expenses deductible in the years paid. Because we concluded that petitioners had failed to carry their burden of proof with regard to the second issue, we held for respondent. We did not decide the first issue.

In holding for respondent, our rationale was that the premium payments in question had served to create a distinct asset. Therefore, they had to be capitalized, rather than being immediately deductible under section 162(a). We found *Commissioner v. Lincoln Sav. & Loan Association*, 403 U.S. 345 (1971), to be controlling. Like the taxpayer in *Lincoln Sav. & Loan Association*, we concluded that petitioner (1) had been given credit for its pro rata share of a reserve; (2) had been given credit for its pro rata share of that reserve's earnings; (3) had been able to apply its interest in that reserve to reduce future premiums; and (4) had been able to retrieve its investment by claiming a refund.

With respect to the fourth factor, we based our conclusion that petitioner had been able to retrieve its investment on our finding that petitioner could have obtained a 100-percent refund 2 years subsequent to canceling the policy, so long as it declined to enter into another policy offered by SOIL. Transferability of the reserve account was a fifth factor relied upon by the Court in *Commissioner v. Lincoln Sav. & Loan Association, supra*. Although that factor was not present here, we found that lack insignificant, given petitioner's ability to obtain a full refund, as described.

Having determined that *Commissioner v. Lincoln Sav. & Loan Association, supra*, controlled, we next considered whether any portion of the premium expenditures in question gave rise to some deduction in the years in issue. We found that premium expenditures in pre-mine-closing years were much higher than warranted by the low risk involved and, thus, in large part, constituted prepayments of the premium for the year in which the mine ultimately closes. We declined to find that the premium expenditures produced any

insurance benefits during the years in question in excess of those determined by respondent. Accordingly, we allowed no deductions in excess of those allowed by respondent.

*Allegations of Error*

Petitioners believe that our findings of fact are in error in two respects. First, petitioners believe that we have misread the SOIL policy (the policy) with regard to petitioner's right to receive a full refund of its reserve account balance. Second, petitioners ask that we reconsider our findings with regard to the "appropriateness of the premium amounts" (i.e., that the premium expenditures produced no insurance benefits during the years in issue in excess of those determined by respondent). Petitioners argue that, if we admit error in the first respect, reconsideration of our findings in the second respect might lead us to revise our opinion in their favor.

*Discussion*

I. *Findings of Fact Reconsidered*

A. *Petitioner's Right to a Refund*

In our previous report, we found the following: the policy permitted petitioner to receive a refund of all or part of its reserve account balance 2 years subsequent to the policy's termination, subject to a deduction of the maximum potential liability for all pending, unresolved claims. (The reserve account balance, as reduced, was referred to in our previous report as the adjusted account balance.) The policy permitted a refund of a percentage of the adjusted account balance, the percentage generally depending upon the number of complete years the policy previously had remained in effect, as follows:

| *Complete years policy in effect* | *Percent refunded* |
|---|---|
| 0–4 | 0 |
| 5–15 | 4 × (number of completed policy years) + 30 |
| 16+ | 100 |

Nevertheless, there were exceptions to the above rule. If the policy had been terminated on or after the anticipated mine-closing date, the percentage refunded would have been 100. Among other circumstances, the policy would have been treated as having been terminated after the anticipated mine-closing date, and petitioner therefore would have received a 100-percent refund, upon petitioner's declining, at any time within 24 months after termination of the policy, to have in force another SOIL policy governed by the manual of rules accompanying the policy (the manual).

The last part of our finding was erroneous. We erred in finding that the policy would have been treated as having been terminated after the anticipated mine-closing date upon petitioner's declining, at any time within 24 months after termination of the policy, to have in force another SOIL policy governed by the manual. Rather, among other circumstances, the policy would have been treated as having been terminated after the anticipated mine-closing date if, at any time within 24 months after termination of the policy, *SOIL* had in force no other policies governed by the manual (i.e., no other such policies with *any* insureds). Thus, as between petitioner and SOIL, in the circumstances described, it was under SOIL's control, not petitioner's, whether the policy would have been treated as having been terminated after the anticipated mine-closing date, thus entitling petitioner to a 100-percent refund. We stand corrected.

B. *Current Insurance Benefit*

Petitioners apparently have no quarrel with our findings that (1) a mine operator, such as petitioner, can expect few black lung claims while the mine operates and many claims shortly after the mine closes, (2) anticipated losses on account of successful black lung claims, therefore, will be much higher for the mine-closing year than for any pre-mine-closing year, and (3) the insurance contract between petitioner and SOIL provides coverage for claims made only during a limited period of time (the policy year and, if the policy is terminated during that year, claims made within 2 years of termination, provided that the miner's last exposure occurred prior to such termination). From those findings, we concluded that (1) SOIL's risk of loss on account of its contract

with petitioner is coordinate with petitioner's risk of loss over the life of the mine, and (2) to reflect accurately the disparity of risk to SOIL between the mine-closing year and any earlier year, the insurance contract logically ought to provide for very small premiums for the pre-mine-closing years and a very large premium in the mine-closing year. Since the actual premiums do not reflect that principle, we concluded that they were not commensurate with the actual risks of loss involved for each year. We concluded that, in large part, the premiums in pre-mine-closing years constituted prepayments of the premium for the year in which the mine ultimately closes. Petitioners challenge that conclusion. They argue that premiums paid in each year were commensurate with the risk transferred to SOIL each year. They argue that the evidence shows that

SOIL is exposed each year, not just to the possible claims against mines still in normal operation, but also to the risk that insured mines might close and terminate their policies early (or substantially reduce their work forces as a result of reduced operations), thereby triggering a large number of claims (and a risk of loss by SOIL).

Early mine closing (or a reduced work force on account of reduced operations) certainly presents the risk that SOIL might be faced with substantial claims before an adequate reserve has been funded out of the relatively constant premium payments called for under the policy. As we stated in our previous report: "The primary consideration in setting premiums is that the present value of premiums received *over the anticipated life of the mine* be sufficient to offset the present value of projected liabilities." *Black Hills Corp. v. Commissioner*, 101 T.C. 173, 178 (1993) (emphasis added). Thus, if the mine were to close earlier than anticipated, with liabilities being no less than projected for the anticipated life of the mine, *and if soil could collect no further premium*, then SOIL necessarily would suffer a loss. SOIL, however, could collect a further premium. In our previous report, we found that, if the policy were terminated earlier than the assumed mine-closing date (due to early mine closing or otherwise), petitioner could be required to pay an additional premium equal to the difference (plus interest) between the premiums actually paid and the premiums that would have been paid had the termination date initially been assumed to be the

mine-closing date (an early termination charge). Given that provision, it is difficult to see how SOIL's risk on account of early mine closing is different from the risk that would accompany mine closing at the end of (or beyond) the anticipated life of the mine. In either case, SOIL underwrote the risk (or so we have assumed) that actual claims might exceed anticipated claims. What petitioners must show us is how much of each year's premium in question related to SOIL's assumption of a risk for that year.

The risk associated with early mine closing is an annual risk. Thus, if petitioner's mine did not close during the first year of the policy, the risk associated with early mine closing during that year would expire at the beginning of year 2. The same would be true for each subsequent policy year up until the year of anticipated mine closing. We do not doubt that there is an appropriate premium for SOIL to charge petitioner each year to bear the risk associated with early mine closing during that year. We suspect, however, that that premium would not be the same for every year, and would be less (perhaps much less) during the early years of operation of a mine than during the later years. Indeed, here, due to a 5-year employment requirement imposed by the policy, only 31 out of 66 active employees of petitioner (47 percent) would have been covered had petitioner terminated the policy at the end of 1983, while 39 out of 68 such employees (57 percent) would have been covered had petitioner terminated it at the end of 1984. Petitioners have not shown us how much of each annual premium payment here in question was in consideration for SOIL's bearing the risk associated with early mine closing during such premium year.

Apparently to show us that the possibility of early mine closing is totally inconsistent with our conclusion of premium prepayments, petitioners quote the testimony of their expert, Mary Hennessey. Ms. Hennessey performed actuarial duties in connection with determining the premiums charged by SOIL for the policy. Ms. Hennessey answered yes to the question: "In your view, did the methodology employed to calculate premiums for SOIL determine an annual premium that was reasonable in light of the risk assumed by SOIL each year?" From that answer, however, we cannot draw any particular information, or reach any conclusion, concerning the year-to-year risk associated with an early mine closing or

the premium charged by SOIL in any year with respect to that risk. Indeed, Ms. Hennessey may have contemplated nothing more than that, from SOIL's perspective, the prospect of relatively constant annual premiums, credited to a reserve account, was a reasonable premium scheme given the relatively low annual risks faced by SOIL prior to the year of expected mine closing.

We concluded our prior report by stating that we were unable to say that any significant portion of the premiums paid by petitioner was designed to compensate SOIL for risk shifted on account of coverage for the years at issue. We explained that petitioners had chosen to argue that the *entire* premiums paid were allocable to coverage for those years, but had failed to carry their burden of proof. Lacking guidance as to a proper allocation of premium charges to coverage, we concluded that respondent's allocation was correct. For the same reasons, we reach the same conclusion here. We add to our prior analysis only that petitioners have failed to show us how much (if any) of the premiums paid to SOIL was allocable to coverage during the years at issue for the risk associated with early mine closing.

## II. *Opinion Reconsidered*

Taking into account our reconsidered findings of fact, we must reconsider (1) our conclusion that *Commissioner v. Lincoln Sav. & Loan Association*, 403 U.S. 345 (1971), is controlling, and (2) our holding (based thereon) that the premium expenditures in question served to create a distinct asset and must be capitalized.

### A. *Commissioner v. Lincoln Sav. & Loan Association*

In *Commissioner v. Lincoln Sav. & Loan Association, supra*, the Supreme Court decided whether "additional premiums" (prepayments of future premiums), paid by the taxpayer, Lincoln Savings & Loan Association (Lincoln), to the Federal Savings & Loan Association, were deductible by Lincoln, in the year paid, as ordinary and necessary business expenses under section 162(a). The Court agreed that payment of the additional premiums satisfied three of the five requirements of section 162(a): (1) Payment was made during the taxable year; (2) it was made in carrying on a trade or business; and (3) it was "necessary", as that term is used in

the statute. *Id.* at 353–354. The Court held, however, that payment of the additional premiums did not meet the "expense" and "ordinary" requirements of section 162(a). *Id.* at 354. The Court found important and controlling that "the * * * payment [served] to create or enhance for Lincoln what * * * [was] essentially a separate and distinct additional asset and that, as an inevitable consequence, the payment * * * [was] capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a)". *Id.*

In our prior report, we relied in part on our finding that petitioner had the virtually unlimited power to cancel the policy and thereby obtain a refund to support our conclusion that the expenditures at issue served to create a distinct asset and therefore had to be capitalized. We can no longer rely on that finding. Petitioner's power to cancel the policy and thereby obtain a refund was *not* virtually unlimited. Unless the policy had been in effect for at least 4 years, petitioner could compel no refund. Petitioners argue that our finding concerning petitioner's power to cancel was critical. They infer that, absent that finding, we cannot conclude that the expenditures at issue served to create a distinct asset and therefore had to be capitalized: "Absent this erroneous finding, it is apparent that * * * [this] is not a *Lincoln Savings* case."

## B. *INDOPCO, Inc. v. Commissioner*

In *INDOPCO, Inc. v. Commissioner*, 503 U.S. ___, 112 S. Ct. 1039, 1044 (1992), the Supreme Court rejected the taxpayer's argument that the decision in *Commissioner v. Lincoln Sav. & Loan Association, supra*, announced an exclusive test for identifying capital expenditures, "a test in which 'creation or enhancement of an asset' is a prerequisite to capitalization, and deductibility under § 162(a) is the rule rather than the exception." *Id.* at ___, 112 S. Ct. at 1044. The Court made clear that, although the creation or enhancement of an asset does serve to distinguish a capital expenditure from an ordinary business expense, the realization of other, somewhat less distinct benefits beyond the year in which the expenditure is made undeniably is important in determining whether the appropriate tax treatment is immediate deduction or capitalization. *Id.* at ___, 112 S. Ct. at 1044–1045.

The Court went on to affirm the findings of the Tax Court and the Court of Appeals for the Third Circuit that the transaction in question produced significant benefits to the taxpayer that extended beyond the tax year in question. *Id.* at ___, 112 S. Ct. at 1045. It concluded that the expenses in question did not qualify as "ordinary and necessary" business expenses under section 162(a), and had to be capitalized. *Id.* at ___, 112 S. Ct. at 1046.

### C. *Significant Future Benefits to Petitioner*

In our previous report, we required capitalization because we found that the expenditures at issue had served to create a distinct asset. Nevertheless, we did not rule out (and, indeed, acknowledged) the possible application of *INDOPCO, Inc. v. Commissioner, supra. Black Hills Corp. v. Commissioner*, 101 T.C. at 186 n.17. As a result, we modify our opinion and specifically rely on *INDOPCO* as an alternative ground for our opinion. In doing so, we do not concede that the expenditures in question did not serve to create a "separate and distinct asset", as that term is used in *Commissioner v. Lincoln Sav. & Loan Association, supra* at 354. True, petitioner's right to compel a refund on termination of the policy was limited: It could compel no refund until the policy had been in effect for 4 full years. After 5 years, however, petitioner could compel a 50-percent refund, with that percentage increasing to 100 after 17 years. Because that feature, among others, accorded petitioner what we consider to be significant benefits extending beyond the premium years in question, we need not resolve whether a distinct asset was created. Those significant benefits are as follows: First, petitioner obtained a guaranteed option to renew its policy (without change in rating methodology). Second (and we do not today change this finding) most (if not all) of the premiums paid during the years at issue were prepayments of a premium relating to the year of closing of petitioner's mine. Third, subject to what might be termed an "early cancellation penalty", petitioner *was* able to obtain a refund of the premiums it had paid. Those benefits we believe to be significant enough that petitioner cannot escape capitalization of the expenditures in question, even if (which we do not

concede) those expenditures do not create a separate and distinct asset. See *INDOPCO, Inc. v. Commissioner, supra.*

III. *Conclusion*

We have revised our findings of fact in one respect, and have revised our opinion accordingly. Petitioners have failed to show that the premium payments made by petitioner to SOIL with respect to the years in question purchased insurance coverage with respect to those years beyond what is reflected in respondent's allowances of deductions. To the extent of those allowances, petitioner incurred ordinary and necessary business expenses deductible under section 162(a); beyond that extent, petitioner's expenditures must be capitalized. See sec. 263(a)(1). Accordingly, respondent's determinations are sustained. If petitioner terminates the policy and is unable to obtain a full refund of amounts required to be capitalized, then that may be the proper time for petitioner to seek an additional tax deduction. As the Supreme Court stated in *INDOPCO, Inc. v. Commissioner*, 503 U.S. at ___, 112 S. Ct. at 1042: "The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery".

*An appropriate order will be issued.*