**BLACK HILLS CORPORATION, doing business as Black Hills Power and Light Company and Subsidiaries, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 94–2527.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 12, 1994.

Decided Jan. 10, 1996.

George R. Abramowitz, Washington, D.C., argued (Dennis L. Allen and Diana E. Buckley, on the brief), for appellant.

David I. Pincus, Department of Justice, Washington, D.C., argued (Gary R. Allen and S. Robert Lyons, on the brief), for appellee.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and SHAW,* District Judge.

---

* The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Missouri, sitting by designation.

McMILLIAN, Circuit Judge.

Black Hills Corp., doing business as Black Hills Power & Light Co. (Black Hills), appeals from a final decision of the Tax Court [1] determining that annual premium expenses for 1983 and 1984 of Wyodak Resources Development Corp. (Wyodak), a subsidiary of Black Hills, for insurance issued by Security Offshore Insurance, Ltd. (SOIL), were capital expenditures and not deductible under § 162(a) of the Internal Revenue Code, 26 U.S.C. § 162(a), as "ordinary and necessary" business expenses. *Black Hills Corp. v. Commissioner*, 101 T.C. 173, 1993 WL 291728 (1993), *modified*, 102 T.C. 505, 1994 WL 100609 (1994). For reversal, Black Hills argues the tax court erred in finding that the premiums paid were not insurance premiums that had been "pooled" into a reserve account and in finding that the future benefits created were not merely incidental and secondary to the insurance coverage. For the reasons discussed below, we affirm the decision of the tax court.

The following statement of background facts is taken in large part from the tax court opinions. Most of the facts are not disputed; the parties stipulated to some of the facts in the tax court proceedings. The tax years at issue are calendar years 1983 and 1984. Black Hills is a South Dakota corporation and the common parent of an affiliated group of corporations that filed consolidated federal income tax returns. During the time of the tax court proceedings, its principal place of business was in Rapid City, South Dakota. Wyodak is a wholly-owned subsidiary of Black Hills that joined in each of these returns. Wyodak operated a surface coal mine in Wyoming during the years at issue.

Under the Federal Coal Mine Health and Safety Act of 1969, as amended, 30 U.S.C. §§ 901–945 (the Act), operators of coal mines are liable for certain compensation, medical and other benefits payments to miners (or their survivors) for black lung disease (pneumoconiosis) and other occupational diseases of the lung. Many miners continue to work

1. The Honorable James S. Halpern, Judge, United States Tax Court.

in mines after contracting black lung disease and file no black lung claims prior to their separation from the work force. As a result, black lung claims against the typical mine operator generally are expected to be much higher for the year in which the mine closes, or substantially reduces the size of its operations, than for any earlier year.

Under the Act, coal mine operators must at all times either maintain commercial insurance covering liability under the Act issued by a company authorized under the laws of any state to insure worker's compensation liability risks or they must qualify as a self-insured with respect to liability under the Act. 30 U.S.C. § 933. In 1982 Wyodak and other unrelated western coal mine operators and other investors formed SOIL to make available black lung liability insurance coverage tailored to the needs of western coal mine operators. Wyodak owned about 9.5% of SOIL's common stock. SOIL was a Bermuda corporation and not licensed to do business in any state or United States territory; therefore, SOIL's insureds were required to qualify as self-insureds under the Act.

In 1983 SOIL issued 7 policies with respect to mines owned, directly or indirectly, by certain of its shareholders, including Wyodak. In 1984 SOIL renewed those policies and issued policies to 2 additional mines. All the policies stated that SOIL indemnified the policyholder for black lung benefits.[2] Each SOIL policy provided coverage for one year beginning on January 1. SOIL assumed responsibility for all claims made during the policy period and, in certain circumstances, during the 2 years following the final policy period. The policy did not cover claims made by employees hired or transferred during the 60–month period preceding termination of the policy. While a SOIL policyholder had the right to renew its policy for successive annual terms ("guaranteed renewable"), there was no requirement that a policyholder renew its policy. Failure to renew constituted termination of the policy.

Each SOIL policy provided that premiums were to be determined in accordance with the SOIL Manual of Rules. The manual provided a methodology for calculating initial and renewal premiums. First, using various actuarial assumptions, SOIL determined the mine's total projected liabilities for black lung claims over the anticipated life of the mine (a minimum of 15 years). Then SOIL redetermined the present value of the total projected liabilities (the total amount that would have to be invested at an assumed interest rate in order to satisfy total projected liabilities). The primary consideration in setting premiums is that the present value of premiums received over the anticipated life of the mine be sufficient to offset the present value of the total projected liabilities. However, it is not considered important that each annual premium accurately reflect the benefits anticipated to be paid by SOIL on account of coverage for that policy year. Even though the losses are expected to be low for each pre-mine-closing year, when there are few if any claims for benefits, and high for the mine-closing year, when many claims may be filed, the premiums are designed to be relatively constant. Premiums collected for pre-mine-closing years are designed to exceed losses for such years, thereby building up a reserve against the high losses anticipated for the mine-closing year. The reserve, combined with an otherwise insufficient premium for coverage in the mine-closing year, is designed to offset projected losses for that year. If the policy is terminated earlier than the assumed mine-closing date, SOIL can require the policyholder to pay an additional premium ("early termination charge") equal to the difference (plus interest) between the premiums actually paid and the premiums that would have been paid had the mine-closing date been as anticipated.

SOIL calculated the premiums it charged policyholders on the basis of the mine operator's individual exposure, as opposed to the exposure characteristics of a group, and esti-

---

2. The policy indemnified the policyholder, within certain limits, against "all compensation, medical and other benefit payments for black lung or other occupational diseases of the lung which the [policyholder] is legally obligated to pay in con-

nection with the mine operation at the location specified in the Declarations and pursuant to the workers' compensation law or the Federal Coal Mine Health and Safety Act of 1969."

mated the amount necessary to satisfy a policyholder's potential claims over the life of that policyholder's mine. As a condition for entering into a contract with SOIL, each mine operator had to represent, based on supporting documentation, that its mine would not close in less than 15 years. In its initial application Wyodak represented that its earliest anticipated year of mine-closing was 2013 (in its 1991 renewal application Wyodak represented that its current estimated mine-closing date was 2041).

For each policyholder, SOIL calculated the initial premium by first computing the total projected future benefits to be paid under the Act for active and inactive employees. The total projected future benefits were discounted to present value and then divided into two components for amortization—"total normal cost" and "total past service liability." The normal cost allocated the projected future benefits as a percentage of payroll over the working life of each employee through the assumed mine-closing date. The past service liability computed the amount of the projected benefits attributable to prior years and was amortized over the lesser of 10 years or one-half the assumed remaining mine lifetime. The two amounts added together, plus an additional 4% (loading) for risk, expenses and profits, constituted the initial premium. The initial premium could be increased by an additional charge for early termination and if the actual payroll exceeded the estimated payroll (the "audit premium").

SOIL used an accounting mechanism (a "reserve account") to calculate the renewal premium. The reserve account was a bookkeeping record of credits and charges to a policyholder. Credits included premium payments, allocated portions of investment income and unrealized securities gains, and credits resulting from the termination of other policies where other policyholders have unrefunded positive reserve account balances. Charges included the estimated present value of approved claims against the policyholder, deductions resulting from the termination of other policies where other policyholders have negative reserve account balances, expenses for handling claims, and allo-

cated portions of unrealized securities losses. The normal cost and past service liability were recomputed each year and adjusted with reference to the policyholder's reserve account.

A policyholder could also receive a refund of all or part of its reserve account balance 2 years after termination, subject to a deduction of the maximum potential liability for all pending, unresolved claims. The policy permitted a refund of a percentage of the adjusted account balance, depending upon the number of years the policy had remained in effect. There were no refunds for policies in effect less than 5 years; for policies in effect from 5 to 15 years, the refund was 30% plus 4% per year; for policies in effect 16 years or more, the refund was 100%. If the policy was terminated on or after the anticipated mine-closing date or for reasons treated as the equivalent of termination on or after the anticipated mine-closing date (for example, at a time when the policyholder no longer faced any liability, the insured no longer qualified as self-insured or there were no other policies in effect), the refund was 100%.

Wyodak paid SOIL an initial premium of $88,589 for 1983 and an audit premium (for higher than estimated payroll) of $8,756, for a total of $97,345. For 1984, Wyodak paid SOIL a renewal premium of $87,666 and an audit premium of $4,459, for a total of $92,-125. Black Hills claimed insurance expense deductions on its 1983 and 1984 consolidated tax returns for these premium payments. The Commissioner determined that, except for the 4% of the premium attributable to "loading," the premiums were not payments for insurance because there was no risk shifting or risk distribution, and, even if the payments were for insurance, the premiums were, for the most part, not ordinary expenses, but instead capital expenditures that were deductible, if at all, in future years. The Commissioner allowed a portion of the premium payments as a current deduction in each year at issue, on the ground that Wyodak received some insurance benefits in those years, but otherwise disallowed the deductions and determined Black Hills owed deficiencies in the amount of $40,494 for 1983 and $42,312 for 1984.

## INITIAL TAX COURT DECISION

Black Hills filed a petition in tax court seeking redetermination of the deficiencies. In August 1993, following a trial, the tax court sustained the deficiencies as determined by the Commissioner. The tax court did not decide whether the premium payments were for insurance, 101 T.C. at 183, but did determine that, even if the premium payments were for insurance, Black Hills had failed to prove the premiums were currently deductible. *Id.* The tax court found that the premiums were capital expenditures because they created the reserve account, which the tax court characterized as a "distinct asset" within the meaning of *Commissioner v. Lincoln Savings & Loan Ass'n*, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971) (*Lincoln Savings*). 101 T.C. at 184–86. The tax court noted that, like the taxpayer in *Lincoln Savings*, Wyodak was credited for its pro rata share of a reserve and that reserve's earnings, was able to apply its interest in the reserve to reduce future premiums, and was able to retrieve its investment by claiming a refund.

The tax court emphasized that the premiums were front-loaded, that is, the premiums charged for years prior to the final year of mine operation were made artificially high so as to reduce—through prepayment—the premium that otherwise would be owed in the final mine-closing year. *Id.* at 185. According to the tax court, in order to reflect accurately the disparity of risk to SOIL between the mine-closing year and any earlier year, the premiums should have been very small in the earlier years and very large in the mine-closing year. *Id.* at 178. However, the actual premiums did not reflect the actual risk involved each year and instead were designed to exceed losses for such years, thereby building up a reserve against the high losses anticipated for the mine-closing year. *Id.* The tax court thus concluded that at least part of the premiums for earlier years constituted prepayments of the premium for the mine-closing year and that the prepayments created a reserve account which was a distinct asset within the meaning of *Lincoln Savings*. *Id.* at 186.

The tax court also concluded that Black Hills' had failed to prove which part of the premiums paid during the years at issue corresponded to insurance benefits received in those years. *Id.* at 186–88. Because Black Hills had made the tactical choice to argue that the entire premium payment should be allocated to coverage for the current year, the tax court could not allocate any particular part of the premiums paid to the years at issue and accepted the Commissioner's determinations of the partial deductions. *Id.* at 188.

## SUPPLEMENTAL TAX COURT DECISION

Black Hills filed a motion to reconsider on the ground that the tax court had incorrectly stated one of the circumstances under which Wyodak would have been entitled to a refund of 100% of the reserve balance. The policy provided for a 100% refund if SOIL, not Wyodak as indicated by the tax court, did not have any policies in force that were governed by the manual. Black Hills also argued that the premiums paid in each year were commensurate with the risk transferred to SOIL for each year. In particular, Black Hills argued that SOIL is exposed each year not only to possible claims against mines still in operation but also to the risk that mines might close and terminate their policies early, thereby triggering the filing of a large number of claims for benefits.

In March 1994 the tax court granted the motion to reconsider and modified its decision by correcting the refund finding. 102 T.C. at 509 (SOIL, not Wyodak, controlled whether the policy would have been treated as having been terminated after the anticipated mine-closing event, thus entitling Wyodak to a 100% refund; thus, Wyodak's power to cancel policy and obtain 100% refund was limited). The tax court rejected Black Hills' argument that the premiums paid in each year were commensurate with the risk transferred to SOIL each year because a mine could close in any year, terminate its policy, and thus cause a loss to SOIL as a result of the filing of a large number of claims for benefits. *Id.* at 510. The tax court acknowledged that early mine-closing presented a risk that SOIL might be faced with substan-

tial claims before an adequate reserve had been funded out of the relatively constant premium payments. However, the tax·court noted that SOIL could require Wyodak (and other policyholders) to pay an additional premium equal to the difference between the premiums actually paid and the premiums that would have been paid had the mine-closing date been as anticipated (the early termination charge). *Id.* at 510–11. The tax court thus concluded that, because SOIL could protect itself by charging an additional premium (the early termination charge), SOIL's risk on account of an early mine-closing was not different from the risk that the mine would close at the anticipated time or later; in either case, SOIL underwrote the risk that actual claims might exceed anticipated claims. *Id.* at 511.

The tax court also reaffirmed its conclusion that Black Hills had failed to show how much of each annual premium should be allocated to coverage during the years at issue for the risk associated with early mine-closing. *Id.* at 512.

The tax court decided that it was unnecessary to decide whether the premiums created a separate and distinct asset within the meaning of *Lincoln Savings* and instead modified its initial decision to specifically rely on *INDOPCO, Inc. v. Commissioner,* 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992) (*INDOPCO* ), as an alternative ground for its decision. 102 T.C. at 514. The initial decision had acknowledged the possible application of *INDOPCO.* 101 T.C. at 186 n. 17. The tax court found that, even if the premiums did not create a separate and distinct asset, they did afford Wyodak significant benefits extending beyond the premium years in question and thus had to be treated as capital expenditures. 102 T.C. at 514–15. The tax court identified those significant future benefits as: Wyodak obtained a guaranteed option to renew its policy without a change in rating methodology; most, if not all, of the premiums paid during the years at issue were prepayments of a premium relating to the mine-closing year; and, subject to what was in effect an early termination penalty, Wyodak could obtain a refund of the premiums it had paid. *Id.* at 514. This appeal followed.

## STANDARD OF REVIEW

■■■ "We review decisions of the United States Tax Court on the same basis as decisions in civil bench trials in the United States District Courts." *Sargent v. Commissioner,* 929 F.2d 1252, 1254 (8th Cir.1991); *see* 26 U.S.C. § 7482. We review de novo legal questions and mixed questions of law and fact; we review findings of fact under the clearly erroneous standard. *See, e.g., West-oak Realty & Investment Co. v. Commissioner,* 999 F.2d 308, 309 (8th Cir.1993).

## *WEBER PAPER* AND POOLED PREMIUMS

■ Black Hills first argues the tax court erred in finding that the premiums paid were not insurance premiums and thus deductible business expenses under § 162(a). Black Hills argues that SOIL pooled its premiums with those of the other policyholders in order to create a reserve fund to cover the uncertain but potentially catastrophic risk that a mine would close early and result in many claims for benefits. Black Hills argues this court held that similar pooled premiums for flood insurance were currently deductible in *Weber Paper Co. v. United States,* 204 F.Supp. 394 (W.D.Mo.1962), *aff'd,* 320 F.2d 199 (8th Cir.1963) (*Weber Paper*).

First, the tax court did not decide that the premiums paid were insurance premiums. 101 T.C. at 183. The tax court assumed for purposes of analysis that the premiums paid were insurance premiums and decided that the premiums paid produced significant benefits to Wyodak that extended beyond the current tax years and therefore had to be capitalized under *INDOPCO.* 102 T.C. at 514–15. We discuss that analysis below.

Next, *Weber Paper* is distinguishable from the present case. The premiums and the reserve fund in each case were designed differently. In *Weber Paper* the taxpayer, a business located near the confluence of the Kansas and Missouri Rivers, had suffered serious flood damage in the flood of 1951 and sought flood insurance. Because none was available, a reciprocal or inter-insurance plan

was created and financed by those exposed to the risk of flood damage. Coverage was provided in the amount of the premiums paid. "The entire premium deposit of [an insured] was required to be credited on the books [of the insurer] to the Catastrophe Loss Account of the individual [insured]. This account was subject to pro-rata charges for flood losses, if any." 320 F.2d at 202. An amount equal to 1% of the insurance coverage was debited from the account and credited to the general reserve fund which was subject to being used in payment of losses if the Catastrophe Loss Account became exhausted. *Id.* The taxpayer sought to deduct the premium deposit as premiums paid for flood insurance. Because the policy provided that the insured could withdraw the entire credit balance in the Catastrophe Loss Account (99% of the annual premium deposit), upon 60 days' notice, after the end of the policy year, the government contended that the taxpayer did not, as a practical matter, lose control of its premium deposits and was instead using the insurance plan as "a convenient depositary for a [non-deductible] contingency reserve." *Id.* at 204. The district court disagreed, holding that the taxpayer did not have control over the account because it was subject to the claims of other insureds and could not be withdrawn until the end of the policy year. 204 F.Supp. at 400. This court affirmed. 320 F.2d at 205.

The feature common to both cases is the reserve. Assuming for purposes of analysis that premiums used to create a reserve against a catastrophic loss are deductible,[3] the reserve in *Weber Paper* was created by the annual premium deposits. In the present case, however, the reserve for early mine-closing claims would not be created by the annual premiums but by the assessment of an early termination charge, that is, an *additional* premium equal to the difference between the premiums actually paid and the premiums that would have been paid had the mine-closing date been as anticipated. The fact that the risk of early mine-closing was accounted for by the early termination charge, and not in the annual premiums, also

undermines Black Hills' argument that the relatively constant premiums were not prepayments of premiums. We discuss that argument next.

## INDOPCO AND FUTURE BENEFITS

Section 162(a) of the Internal Revenue Code allows the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162(a). In contrast, § 263 of the Code allows no deduction for a capital expenditure—an "amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." § 263(a)(1). The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreciated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise. Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes.

*INDOPCO,* 503 U.S. at 83–84, 112 S.Ct. at 1042–43 (citations omitted). "[D]eductions are strictly construed and allowed only 'as there is a clear provision therefor.'" *Id.* at 84, 112 S.Ct. at 1043 (citations omitted). The Supreme Court has acknowledged that "'decisive distinctions' between current expenses and capital expenditures 'are those of degree and not of kind'" and "each case 'turns on its special facts.'" *Id.* at 86, 112 S.Ct. at 1044 (citations omitted).

In *Lincoln Savings* the Supreme Court determined that in order to qualify for deduction under § 162(a), "an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3)

---

**3.** The government does not concede this point and notes that reserves for losses, even for catastrophes, are not deductible. Brief for Appellee at

33 & n. 18; *see United States v. General Dynamics Corp.,* 481 U.S. 239, 107 S.Ct. 1732, 95 L.Ed.2d 226 (1987).

be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." 403 U.S. at 352, 91 S.Ct. at 1898. In that case the Supreme Court decided that certain premiums required by federal statute to be paid by a savings and loan association for deposit insurance were not "ordinary and necessary" expenses under § 162(a) but were instead capital expenditures. *Id.* at 354, 91 S.Ct. at 1899. The premiums created a secondary reserve fund in which each insured institution retained a pro rata interest recoverable in certain situations. Although the premiums were paid during the taxable year, were made for carrying on a trade or business and were "necessary," the Court found that the premiums were not "ordinary expenses" because they "serv[ed] to create or enhance for [the institution] what is essentially a separate and distinct additional asset." *Id.*

In *INDOPCO* the taxpayer sought to deduct certain professional expenses incurred in the course of a friendly takeover. The taxpayer had argued that *Lincoln Savings* had announced an exclusive test for identifying capital expenditures, that is, the creation or enhancement of an asset, and that because the disputed expenses did not create or enhance a separate and distinct additional asset, they could not be capitalized and therefore were deductible under § 162(a). The Supreme Court rejected the taxpayer's reading of *Lincoln Savings* and held the fact that the expenditures did not create or enhance a separate and distinct additional asset is not controlling. 503 U.S. at 83–90, 112 S.Ct. at 1042–46.

The Court noted that *Lincoln Savings* did not hold that "*only* expenditures that create or enhance separate and distinct assets are to be capitalized under § 263." *Id.* at 86, 112 S.Ct. at 1044. The Court explained that *Lincoln Savings* did not "consider the tax treatment of expenditures that, unlike the additional premiums at issue there, did not create or enhance a specific asset, and thus the case cannot be read to preclude capitalization in other circumstances." *Id.* at 87, 112 S.Ct. at 1044. The Court clarified that "[a]lthough the mere presence of an incidental future benefit—'*some* future aspect'—may not warrant capitalization, a taxpayer's real-

ization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization." *Id.* The Court thus concluded that the disputed expenses, which had been " 'incurred for the purpose of changing the corporate structure for the benefit of future operations,' " *id.* at 89, 112 S.Ct. at 1045 (citations omitted), were capital in nature because " 'the purpose for which the expenditure is made has to do with the corporation's operations and betterment, sometimes with a continuing capital asset, for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year.' " *Id.* at 90, 112 S.Ct. at 1046 (citation omitted).

*INDOPCO* was an alternative ground for the tax court's supplemental decision. 102 T.C. at 514. The tax court assumed for purposes of analysis that the premiums did not create a separate and distinct additional asset and found that the premiums produced significant benefits which extended beyond the current taxable years, specifically, the guaranteed option to renew, the prepayment of the premium relating to the mine-closing year, and the potential refund of premiums paid, and thus had to be capitalized. *Id.* Black Hills argues the tax court erred in finding that the future benefits created by the premiums were "significant" within the meaning of *INDOPCO* because any future benefits were merely incidental and secondary to the insurance coverage provided during the current taxable years. Black Hills specifically argues the premiums paid in the years at issue were not prepayments of the premium for the mine-closing year, the refund provision was severely limited, and the guaranteed renewal option was merely incidental to the underlying coverage.

■ After *INDOPCO*, the fact that the premiums may not create or enhance a separate and distinct additional asset is not controlling. 503 U.S. at 90, 112 S.Ct. at 1046. The issue is whether the taxpayer realized benefits beyond the year in which the expenditure is incurred and requires an inquiry into the duration and extent of those benefits. *Id.* at 87–88, 112 S.Ct. at 1044–45. We

agree with the tax court that Black Hills failed to demonstrate that the premiums paid were deductible as ordinary and necessary business expenses.

The record supports the tax court's finding that the premiums paid produced significant benefits to Wyodak beyond the tax years in question and does not support Black Hills' characterization of those benefits as merely incidental or secondary. As discussed above, the risk that the mine would close early was not factored into the calculation of the annual premiums but was instead accounted for by an additional premium, the early termination charge. The early termination charge also undercuts Black Hills' argument that at least part of the premiums created a reserve against the risk of early mine-closing. Due to the timing of the filing of black lung claims, the risk of loss was much greater during the mine-closing year than in earlier years, but the relatively constant premiums did not reflect this disparity of risk between the mine-closing year and the earlier years. Thus, to the extent that the premiums were not commensurate with the risk of loss during each year, the premiums constituted pre-payments of the premium for the mine-closing year. Even assuming that there was an unquantified risk of early mine-closing during each year, because Black Hills took the position that the entire premium payment should be allocated to coverage for that year, Black Hills did not prove how much of each premium payment could be allocated to coverage for each year.

The tax court also found that the refund provision was a significant future benefit.

After 5 years, Wyodak could compel a 50% refund; the refund increased 4% per year thereafter and after 16 years was potentially 100%. The right to a refund, although limited, was not so remote as to be merely incidental.

Finally, the guaranteed option to renew was also a significant future benefit. According to the record, the mine operators viewed the guaranteed option to renew, without change in rating methodology, as an important feature of the SOIL policy. Mine operators were concerned about the possibility that a commercial insurer would cancel coverage if a claim for benefits was filed, leaving the mine operator without coverage when the mine closed (when most of the claims for benefits would be filed). In addition, the guaranteed option to renew was important to the refund provision because the policyholder became eligible for a partial refund of premiums after 4 years and the potential percentage of premiums refunded increased over the years.

In sum, we hold the premiums paid produced significant benefits that extended beyond the current tax years and therefore did not qualify for deduction as ordinary and necessary business expenses under § 162(a).

Accordingly, the decision of the tax court is affirmed.[4]

4. Black Hills argues that the tax court illogically concluded that the policy ought to have provided for very small premiums for the pre-mine-closing years and very large premiums in the mine-closing year. Black Hills compares the risk of early mine-closing in the present case with the risk of catastrophic flooding in the *Weber Paper* case and argues that, under the tax court's analysis of the premium structure, the flood insurance should have required a very small premium in the pre-flood years and a very large premium in the flood year, contrary to basic risk-spreading principles underlying insurance.

These risks are not the same. The risk of catastrophic flooding is roughly the same every year. However, due to the timing of black lung claims, the risk that actual black lung claims would exceed anticipated black lung claims was much lower during the early years of mine operation than during the later years. The mine operator could expect few claims while the mine operates and many claims shortly after the mine closes. Therefore, anticipated losses on account of successful black lung claims will be much higher for the mine-closing year than for any pre-mine-closing year. For this reason, there is a disparity of risk to the insurer between the mine-closing year and any earlier year, and the policy logically ought to have provided for very small premiums for the pre-mine-closing years when the risk of loss was relatively small, and very large premiums for the mine-closing year, when the risk of loss was much higher. Because the actual premiums were not commensurate

with the actual risks of loss involved for each year, the tax court concluded that, in large part, the premiums for the pre-mine-closing years constituted prepayments of the premium for the mine-closing year.

The risk of early mine-closing, whether of the insured or of other mines, is no different from the risk that would accompany mine-closing at the end of (or beyond) the anticipated life of the mine. It is also a risk which is probably much lower during the early years of mine operation than during the later years. 102 T.C. at 511. The insurer could collect an additional premium if the policy were terminated earlier than the anticipated mine-closing date (the early termination charge). In addition, because the policy imposed a 60–month employment requirement, the risk would have been lower because fewer employees were covered during the early years of mine operation.

The tax court did not ignore Black Hills' expert testimony. The tax court assumed that the risk of early mine-closing was an annual risk and required Black Hills to show how much of each year's premium was attributable to that risk. Black Hills' expert testified that the methodology employed to calculate the annual premiums was reasonable in light of the risk assumed by the insurer, including the risk of early mine-closing. However, the expert testimony did not specify the annual risk associated with early mine-closing or identify what portion of the premium should be allocated to coverage for that risk. *Id.* at 512.

Finally, the tax court's analysis did not overlook the presence of risk-shifting or risk-distribution. The government conceded that insurance risk was present but argued that there was no risk-shifting or risk-distribution. The tax court was not prepared to agree with the government's position, but did not need to decide whether the payments were for insurance. 101 T.C. at 183. Indeed, the tax court accepted for purposes of analysis that insurance risks were shifted and distributed and that the payments were insurance premiums, *id.*, and decided that the payments were not currently deductible because they produced significant future benefits, that is, significant benefits that extended beyond the current tax year. 102 T.C. at 514, *applying INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 112 S.Ct. 1039, 117 L.Ed.2d 226 (1992) (significant future benefits test).